UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA,              :
                                                       :
                                                       :        **MEMORANDUM & ORDER**
            -against-                          :        06-CR-832 (DLI)
                                                       :
                                                       :
WENGE CASSEUS, et. al.                    :
                                                       :
                  Defendants.               :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Defendant Wenge Casseus is charged with conspiracy to distribute and to possess with the intent to distribute crack and powder cocaine; attempted possession with the intent to distribute crack cocaine in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii) & (ii)(II) and 18 U.S.C. § 3551 et. seq.; possession and use of a firearm in furtherance of cocaine trafficking crimes in violation of 18 U.S.C. 924(c)(1)(A)(i) & 3551 et. seq; and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) & 3551 et. seq. Before the court is defendant's motion to suppress a firearm that was recovered from an automobile he was using, and certain pre-arrest statements he made to the police. A suppression hearing was held and concluded on August 8, 2007 during which the court took testimony from Detective John McHugh and the defendant. Det. McHugh gave consistent and credible testimony. The court finds defendant's testimony credible to the extent that it corroborates the testimony of Det. McHugh and to the extent indicated below. For the reasons set forth below, the motion is denied in its entirety.

# I. Findings of Facts

On November 8, 2006, at approximately 7:30 p.m., Stean Aulder was fatally wounded by gunfire outside 1668 Rosalind Avenue in Elmont, New York. (Tr. 8). Nassau County Police officers saw defendant speaking to co-defendant Sakora Varone near the crime scene inside the area sealed off by yellow police tape. (Tr. 59).[1] The defendant, who is now 25 years old, later admitted that he had stepped into the crime scene at around 7:45p.m. to inquire into the status of Aulder who was his friend. (Tr. 64). The police asked the defendant where he was going, and he replied that he was going to visit Aulder at the hospital. (Affidavit of Wenge Casseus in Support of the Motion ("Casseus Aff.") ¶ 2). It was raining and the police asked him to come to the police station to answer some questions about Aulder. (Tr. 60). Defendant stated that he was on parole and had an 8 p.m. curfew, but agreed to go to the police station. (Id.) Defendant does not deny that he went to the police station voluntarily.

In the ten-minute ride to the Mineola police station, defendant used his cell phone to call Aulder's brother, who said he would come to the police station with an attorney. (Casseus Aff. ¶ 3). According to the station house sign-in sheet, the defendant arrived at 8:55 p.m. (Gov. Exh. 3500-JEM-3, Pg. 472). Several police officers and detectives questioned defendant briefly about the possessions on his person (Tr. 28, 46) and his ties to Aulder. (Tr. 71). Then defendant waited for about 15-20 minutes for an interview with Detective John McHugh. Defendant acknowledged that,

---

[1] Sakora Varone, a co-defendant in this case, had accompanied Stean Aulder out of the second story apartment at 1668 Rosalind Avenue, shortly before the latter was shot on the street. (Gov't Response in Opposition to Defendant's Motion to Suppress at 2).

during this time, he was not under arrest and could freely place cell phone calls. (Tr. 58).[2]

John McHugh, a 32-year veteran of the Nassau County Police, testified that his interview with the defendant took place in the Homicide Squad Office, and began at about 10 p.m. (Tr. 8, 37-38). He explained that he was investigating the shooting of Aulder and wanted to ask the defendant a few questions. The defendant did not object. After several basic questions, Det. McHugh read the defendant the *Miranda* warnings as a precautionary measure, and the defendant signed a *Miranda* card at approximately 10:15 p.m. (Tr. 11-13, 32, 74, 88; Gov. Exh. 1). The card indicated defendant's willingness to answer questions freely and voluntarily without talking with a lawyer or having one present. (Gov. Exh. 1). Prior to this interview, Det. McHugh was informed by fellow officers that a large quantity of cocaine was found in the second story apartment at 1668 Rosalind Avenue. (Tr. 13-14). He also had learned from Sakora Varone that the defendant was Aulder's partner in cocaine trafficking. (Tr. 15). He was aware that defendant was on parole for a prior conviction and was carrying, in addition to the two cell phones, approximately $2,000 in cash. (Tr. 12-15). Det. McHugh learned from the defendant aspects of the latter's criminal background including a prior conviction for gun possession and past arrests for marijuana and cocaine charges. (Tr. 13).

The defendant revealed that he had gone to the apartment that afternoon and evening and knew of the large quantity of drugs stored there. (Tr. 13). He indicated that he was there simply to talk and had no involvement with the narcotics. (Tr. 14). Det. McHugh testified that, prior to this

---

[2] At the hearing, Defendant tried to claim that he was not speaking on his cell phones while waiting for Det. McHugh as the phones were taken away from him. (Tr. 73). This account conflicts with his own testimony at other points during the hearing (Tr. 58, 79), as well as that of Det. McHugh who found defendant talking simultaneously on two cell phones before the interview began (Tr. 6, 10). The court credits the detective's testimony on this point.

point, about one hour into the interview, defendant was free to leave, but he never requested to do so. (Tr. 29-30). After this point, Det McHugh believed he had probable cause to arrest the defendant but did not do so; rather, he continued with the interview. He then asked the defendant how he came upon the crime scene. The defendant's account varied.

First the defendant said that about fifteen minutes before the shooting, he left the apartment to buy a telephone card from a gas station around the corner on Hempstead Turnpike when he learned of the shooting from Sakora Varone and hurried back. (Tr. 15-16). Det. McHugh then asked why it took him fifteen minutes to buy the telephone card in the pouring rain when the gas station was only a block away. (Tr. 60). Defendant initially suggested that the first gas station was out of telephone cards and that he had to go to another gas station before finally admitting that he had in fact left the apartment prior to the shooting in his girlfriend's 1999 Ford Taurus and was driving toward Laurelton, Queens when he received a call from Varone regarding the shooting (Tr. 18). He then drove back and could not get close to the crime scene due to the investigation, so he parked his car on Emporia Avenue, near Sakora's house, one block west of the apartment. (Tr. 19-20, 47).

Upon learning that defendant's car was parked near the crime scene, McHugh requested confirmation from fellow officers. This was done within another half hour, or approximately two hours after the interview began. (Tr. 21). During this period, defendant apparently requested permission to leave, but was denied in his request. (Tr. 77). Det. McHugh then told defendant that the police wanted to search the vehicle (Tr. 23). The defendant stated that nothing in the car would relate to the Aulder shooting and consented to the search. (Tr. 23). Det. McHugh prepared a "Search of Premises/Vehicle Consent" form which states explicitly that consent is given "to enable police officers to search for . . . controlled substances, weapons [and] cell phones." (Gov. Exh. 2;

Tr. 24). Det. Defendant read and signed the form. (Tr. 36, 49). McHugh testified that he included weapons and controlled substances on the form after learning of defendant's past arrests. In his testimony, the defendant countered that his consent to search was coerced by the police who threatened to search the car with a warrant if he withheld his consent. (Tr. 50). He gave three different accounts of how the threat was conveyed to him.[3] Det. McHugh testified consistently that he alone presented the defendant with the consent form and denied ever suggesting that the car would still be searched if the defendant withheld his consent. (Tr. 26, 33-34, 37-39).

The police search of the car uncovered a loaded Kel-Tec p-11 nine millimeter Luger semi-automatic pistol secreted in the insulation under the hood. (Tr. 44). After the gun was located, the defendant was arrested in the early morning hours of November 9, 2006. He then waived his rights and gave a full confession to Drug Enforcement Administration Agents Norton Cordova and David Wilson and Nassau County Police Department Detectives Carl Re and Mark Garry. (Casseus Aff. ¶ 5). He admitted that he had tried to conceal the fact that he had driven to the crime scene because he did not want the police to know about the car which contained the gun. (Tr. 66-67). He also admitted that the gun was his and knew that possession of such a firearm was a violation of his parole terms. (Tr. 87). He further admitted that he concealed the gun inside the insulation underneath the hood of the car. The car was purchased by his girlfriend who gave him permission to use it. (Tr. 87-88).

---

[3]     In the first version, defendant said Det. McHugh and an unidentified officer presented him with the search consent form and it was the unidentified officer who told him that the car would be searched regardless of whether he consented. (Tr. 49). In the second version, he suggested that the unidentified officer from the first version was Det. Carl Re. (Tr. 50). In the third version, he pointed to Det. McHugh as the person who warned him that the car would be searched with a warrant should he refuse to sign the consent form. (Tr. 84).

## II. Conclusions of Law

Defendant moves to suppress his pre-arrest statements on the grounds that he was not given a *Miranda* warning at the outset of his questioning by the police and that he was denied access to counsel during his interview. He also moves to suppress the gun recovered from the search of his girlfriend's car.

### A. *Miranda* Issue

*Miranda* warnings are only required where an individual is subject to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966). "Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement)." United States v. Rodriguez, 356 F.3d 254, 258 (2d Cir. 2004) (internal citations omitted).

In this case, the police noticed the defendant at the murder crime scene. Pursuant to their homicide investigation, they properly questioned him regarding the reason for his presence there and his relationship to the shooting victim. The defendant was never compelled to speak to the police. He voluntarily accompanied the police to the station house, arriving at 8:55 p.m. He was not in custody nor was he ever restrained from leaving the police station *before* his *Miranda* warnings were given at 10:15 p.m. Until his interview with Det. McHugh, the defendant was free to make cell phone calls and answered brief questions from the police. The *Miranda* warning that Det. McHugh

gave was done as a precautionary measure. It was later in the interview, after the defendant had disclosed his knowledge of the cocaine found in the apartment, which supported Varone's statements implicating him as Aulder's narcotics trafficking partner, that the police had probable cause to detain him. Thus, the defendant's *Miranda* rights were not violated as the warning was given well before his interview had turned into a custodial interrogation. As such defendant's pre-arrest statements are admissible.

## B. Right to Counsel Issue

In order to invoke the right to counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). In his affidavit in support of the motion, the defendant alleges that, while riding in the back of the police car to the police station, he spoke with Aulder's brother who told the defendant that he was sending an attorney to the police station. There is no indication that the police overheard Aulder's brother tell the defendant that an attorney was coming to the station house. Defendant asserts that the police knew that he was represented by counsel and knew that counsel was at the police station waiting to speak to him. There is no evidence, however, of the defendant ever requesting counsel at any point during his discussion with the police. He signed the *Miranda* card, which documented his willingness to answer questions without a lawyer present.

Even if the defendant is correct in asserting that the police had knowledge that counsel was waiting to speak to him at the station house, this fact cannot substitute for the requirement that the defendant himself must invoke his right to counsel. See Moran v. Burbine, 475 U.S. 412, 443 (1985) (emphasizing that the right to counsel must be invoked by the person who holds that right.); United

States v. Palmeri, 97-CR-356, 1998 WL 765138 *2-3 (E.D.N.Y. April 20, 1998) (Gleeson. J.) ("[i]f the Supreme Court's holding that a suspect's Fifth Amendment rights are 'personal' is to have any meaning, then the fact that an attorney who attempts to invoke those rights without her client's knowledge was previously retained by that client, and not by a third party, should make no difference."). The defendant has not established that he was denied access to counsel. Accordingly, his motion to suppress the statements on this ground is denied.

## C. Search of the Car

The defendant contends that the gun found in the car must be suppressed because the search of the automobile violated his Fourth Amendment rights. As an initial matter, a borrower of a car may have standing to challenge the search. United States v. Pena, 961 F.2d 333, 337 (2d Cir. 1992) ("It is not the law, however, that only the owner of a vehicle may have a Fourth Amendment privacy interest therein that is protected against governmental invasion. Rather, the borrower of an automobile can possess such an interest."). The defendant bears the burden of demonstrating that he had "a subjective desire to keep his [] effects private" and that his "subjective expectation must be one that society accepts as reasonable." Smith v. Maryland, 442 U.S. 735, 740 (1979). In hiding his gun under the hood of the car, defendant no doubt showed a subjective desire to keep the gun private. But he has not shown that his expectation of privacy is one that was reasonable under the circumstances or that society is prepared to accept.

The defendant was on parole and, as a condition of his parole, signed a release subjecting himself to searches without a warrant. Parolees have "a severely diminished expectation of privacy" because they are aware that supervision officers can intrude into their residence. United States v. Newton, 369 F.3d 659, 664-66 (2d Cir. 2004)(internal citation omitted). See also Samson v.

California, 126 S.Ct. 2193, 2197-2202 (2006) (upholding a *suspicionless* search of a parolee because, under California state law, parolees are required to agree in writing to be searched at any time, with or without cause, and therefore have no expectation of privacy). Given the fact that the defendant knew he was subject to warrantless searches, the court is unable to find that he had a reasonable expectation of privacy in the insulation underneath the hood of a borrowed car that he had parked next to a crime scene where his friend was just gunned down.

Even if he did have a privacy interest in the hood of the car, notwithstanding his parole status and his connection to Aulder's drug business and the crime scene, the defendant nevertheless consented to waiving that interest when he signed the consent search form at the Mineola police station. He contends that the consent was coerced, claiming that he was told that the car would be searched regardless of whether he consented to the search. The government disputes that defendant was ever threatened and points to inconsistencies in his account of how this purported threat was conveyed to him.

The government has the burden of demonstrating voluntariness of the consent under the "totality of all the circumstances." United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2006) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). The court uses an objective standard to determine the voluntariness of consent. United States v. Garcia, 56 F.3d 418, 422-23 (2d Cir. 1995). Factors courts have considered in determining whether a consent was coerced or was the product of the defendant's free will include "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." United States v. Guarno, 819 F.2d 28, 30 (2d Cir.1987)

(quoting Schneckloth, 412 U.S. at 226) (citations and footnote omitted)).

The consent form was presented to the defendant after Det. McHugh had found probable cause to arrest him. After that point in the interview, defendant was no longer free to leave and was technically in police custody. The fact that defendant was in custody at the time the consent was given does not, by itself, invalidate the consent provided. United States v. Crespo, 834 F.2d 267, 271 (2d Cir.1987) (that defendant was under arrest, in custody, or even handcuffed, does not require finding of coercion). Rather the voluntariness of consent given in custody requires more careful scrutiny. United States v. Puglisi, 790 F.2d 240, 243 (2d Cir.1986).

It is not disputed that the defendant, who had substantial prior contact with the criminal justice system, read and understood the consent conform, which clearly informed him of his constitutional right to be free of any search of the vehicle except with a search warrant and of his right to refuse to consent to such a search. The mere fact that the defendant may have been told that the police would obtain a warrant even in the absence of the defendant's consent does not make the consent invalid. See United States v. Yu-Leung, 51 F.3d 1116, 1119 (2d Cir. 1995) (defendant voluntarily gave consent to search his house despite the fact that the police told him that they would remain in his house until they received a search warrant if he did not consent to the search); United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983) ("advising a person of the fact that a search warrant can be obtained does not constitute coercion.").

After carefully considering the totality of the circumstances including the defendant's age, familiarity with criminal proceedings, awareness of the situation he was in, the nature and length of his interview, the credibility of his testimony, and conduct of the police detectives, the court concludes that defendant's consent to search the car was voluntarily given, despite his subsequent

protestations otherwise.  Accordingly, his motion to suppress the gun is denied.

### III.  Conclusion

For the reasons set forth above, the defendant's motion to suppress is denied in its entirety.

DATED:      Brooklyn, New York
           November 15, 2007

_____
/s/
DORA L. IRIZARRY
United States District Judge